JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
FAX (619) 699-5996
Attorney for Defendant RUBIO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DIEGO RUBIO-GASTELUM,<br><br>Defendant. | ) | CASE NO. 07CR3283WQH<br><br>NOTICE OF MOTIONS AND SECOND MOTION TO COMPEL DISCOVERY, TO DISMISS, TO SUPPRESS<br><br>STATEMENTS AND EVIDENCE AND LEAVE TO FILE FURTHER MOTIONS |

TO: KAREN HEWITT, UNITED STATES ATTORNEY;
CHRISTOPHER TENORIO, ASSISTANT UNITED STATES ATTORNEY:

The defendant, Diego Rubio-Gastelum, by and through his counsel, Kerry Bader, respectfully asks this Court to grant the motions listed below.

Dated: February 13, 2008

//JOAN KERRY BADER
Joan Kerry Bader,
Attorney for Defendant
Rubio-Gastelum

//

//

//

//

//

//

JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
fax (619)699-5996
Attorney for Defendant RUBIO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DIEGO RUBIO-GASTELUM,<br>Defendant. | CASE NO. 07CR3283WQH<br><br>MOTIONS TO COMPEL DISCOVERY, TO DISMISS THE INDICTMENT, TO SUPPRESS STATEMENTS AND EVIDENCE, AND LEAVE TO FILE FURTHER MOTIONS |

**I.**

**STATEMENT OF FACTS**

On or about November 18, 2007, Mr. Rubio was arrested at a Border Patrol checkpoint in the Southern District of California. 31 USC section 5332, Bulk Cash Smuggling, in the amount of approximately $250,000.00. He has since been indicted and is charged with Money Laundering, a violation of 18 USC section 1956h.

Mr. Rubio remains in custody at the Metropolitan Correctional Center on San Diego, California.

//

//

//

//

II.

**MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE AND TO DIMISS THE INDICTMENT OR IN THE ALTERNAITVE, TO SUPPRESS STATEMENTS**

**A. The Government bears the burden of proving that the search and seizure in this case was reasonable and as this search was not reasonable, the evidence must be suppressed**

Mr. Rubio has already moved for the production of the discovery. Some has been discovered but none of the evidence concerning the reliability of the canine that conducted a search in this case has been discovered. The vehicle in this case arrived at the Checkpoint and it was sent to secondary where the canine conducted a sniff search of the exterior of the car.

The government had advised the defense that if the case was not resolved with a plea, then it would provide such discovery.

This request is based on United States v. Caballes, 543 U.S. 405, 409 (2005) which states that canine searches may be lawful if the canine is "a well-trained and reliable dog." If the dog is not proven to be so, the search is presumably unreasonable.

Mr. Rubio now asks for such discovery, including, but not limited to, tests results of the canine's reliability, in both controlled and uncontrolled settings, records of the canine's alert for that led to seizures and those that did not lead to seizures, and the substance of those seizures.

Counsel for Mr. Rubio will file article from CBS News with the Court taken from the Internet. Among other things,

the article cites various cases where dogs had very poor accuracy rates.

The article also warns of fraudulent trainers, including a defendant who was convicted of 25 counts of fraud after providing the State Department, the IRS and the Federal Reserve with bomb-sniffing dogs who could not detect 50 pounds of dynamite or 15 pounds of C-4 plastic explosives.

*Notably, according to the discovery provided so far, this canine is trained and certified to detect narcotics, specifically, Cocaine, Heroin, Marijuana, Methamphetamine, their derivatives and humans, not monetary instruments. This factor alone leads to the conclusion that the evidence and statements stemming from this search should be suppressed.*

Otherwise, the training and certification records of the dog are necessary, as well as discovery concerning the trainers, the agency or organization that trained the animal and its handler/s, including how, and what they are trained to do while they is working and who certifies them and on what bases. The records should include how the animal is able to determine that these particular substances and how it is supposed to alert to each of them.

**B. The Government should not profit or gain tactical advantage from making Mr. Rubio's statements "unavailable" and thus the Indictment should be suppressed or, in the alternative, the statements should be suppressed**

The government acknowledges that taping of Mr. Rubio's first interrogation, which took place at the Highway 8 Checkpoint, was recorded both by tape and either digitally or by video. The government has advised defense counsel that ""neither recording from the Highway checkpoint "is available." At the same time, the government has provided a written report prepared by one of those interrogating agents alleging that Mr. Rubio confessed to a myriad of allegations that initially resulted in a complaint charging him with Cash Bulk Smuggling and then later, Conspiracy to Commit Money Laundering.

The government should not be permitted to prosecute someone on these serious charges where the main allegations were recorded and are now are "unavailable." Without these recordings, the Indictment should be dismissed.

At the same time, Mr. Rubio renews his request for this discovery of the two recordings from the Checkpoint interrogation as the government must disclose to the defendant <u>all</u> copies of any written or recorded statements made by the defendant and any response to any <u>Miranda</u> warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

In the event that these tapes are not handed over, the defense respectfully asks the Court to dismiss the Indictment or, at least, prevent the government from using the agents' reports that contain their summary as to what was said and any subsequent statements made to other agents. In other words, the defense asks the Court to suppress *any and all* subsequent statements made to other officers, that were taken and recorded also at the Chula Vista Border Patrol office. In making this request Mr. Rubio relies on Brady v. Maryland, 373 U.S. 83 (1963). and Seibert v. Missouri, 542 U.S. 600 (2004).

The agents in this case arrested Mr. Rubio at the Highway 8 Checkpoint. They interrogated Mr. Rubio at about 6:20 in the morning and they say they recorded his statements by two types of recordings. The AUSA says those recordings are "unavailable." As those recordings comprise the basis of the government agents' assertions and allegations that Mr. Rubio confessed to this crime and they allege facts that they say would support a number of different charges and sentencing enhancements, they should be handed over under both Brady and Rule 16.

"Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).

If the tapes are not handed over, Mr. Rubio asks the Court to dismiss the case or to suppress all the statements,

so that the government will not benefit from an unfair tactical advantage to the prejudice of the defendant.

**C. The Government must hand over all impeachment evidence of the arresting agents**

In addition, as Brady is a rule of disclosure which requires the government to hand over to the defense evidence that [i]mpeachment evidence may constitute Brady material "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence" Mr. Rubio asks for such evidence concerning the arresting agents in this case from the Checkpoint. United States v. Blanco, 392 F.3d 382, 387 (9th Cir. 2004). A defendant is entitled to impeachment evidence regarding any government agent that testifies at trial. United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991). And, under Brady, the defense is entitled to all evidence which effects the credibility of the agents - in short- impeachment evidence.

**D. Any statements made by Mr. Rubio should be suppressed as they were not founded on a valid Miranda waiver nor were they intelligently or voluntarily made.**

Seibert v. Missouri forbids the use of statements against a defendant where they were obtained as a result of an illegal "two-step" procedure utilized by police. Mr. Rubio asks the Court to suppress based on all of the theories expressed by the Supreme Court in Seibert. 542 U.S. 600 (2004), although not all were adopted, and on other

well-established grounds showing that Mr. Rubio's statements were involuntarily made and his alleged waiver was not freely and intelligently given.

The Seibert's Court's holding is that a signed Miranda waiver is not in compliance with Miranda where the police officer's question-first tactic effectively thwarts Miranda because the Miranda warnings are given after the suspect confesses and the warnings are inserted in the midst of the questioning, with the result being that the Miranda warnings are minimized in the minds of suspects because they are inserted into the questioning only after the interrogation is well underway. "The object of the question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 611.

In other words, "[t]he threshhold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier" Id. at 611-612. It bears emphasizing that the effectiveness *Miranda* assumes the warnings must potentially extend through the repeated interrogation, since a suspect has a right to stop at any time. It seem highly unlikely that a suspect could retain any such understanding when the

interrogator leads him through a line of questioning the suspect has already answered fully." Id. n. 5.

The Court addressed this issue because of the following concern:

> The technique of interrogating in successive, unwarned and warned phases raised a new challenge to *Miranda*. Although we have no statistics on the frequency of this practice, it is not confined to Rollo, Missouri. An officer of that police department testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by national police training organization (sic) and other departments in which he had worked. App. 31-32. Consistently with the officer's testimony, the Police Law institute, for example, instructs that "officers may conduct a two-stage interrogation .... At any point during the pre-*Miranda* interrogation, usually after arrestees have confessed, officers may then read the Miranda warnings and ask for a waiver. Of the arrestees waive their *Miranda* rights, officers will be able to repeat any *subsequent* incriminating statements later in court." Police Law Institute, Illinois Police Law Manual 83 (Jan. 2001 - Dec. 2003) (available in the Clerk of Court's case file)(hereinafter Police Law Manual.... The upshot of all this advice is a question-first practice of some popularity, as one can see from the reported cases describing its use, sometimes in obedience to departmental policy. Id. at 610-611.[1]

---

[1]The Court then noted another practice whereby some police training programs advise officers to omit Miranda warnings altogether or to continue questioning *even if the suspect invokes his rights*, knowing that while the statements may not be used in the prosecutor's case-in-chief, they can be used for impeachment purposes. Among other agencies and documents, the Court cited the Police Law Manual and California Commission on Peace Officer Standards and Training, Video Training Programs for California Law Enforcement, Miranda: Post-Invocation Questioning(broadcast July 11, 1996)("We ... have been encouraging you to continue to question a suspect after they've invoked their Miranda rights."). Id. at 611.

The Court had granted cert to resolve the split between the circuits as to whether statements obtained by police tactics which result in an end run around Miranda should be suppressed because they are fruits of the poisonous tree, or because they are involuntarily given. Id. at 607.

The majority of justices opined that the two-step interrogation procedure ought to be analyzed under the voluntariness standards that are central to the Fifth Amendment and Oregon v. Elstad, 470 U.S. 298 (1985). In other words, did the initial violation of the suspect's rights (the failure to Mirandize) lead to an involuntarily made statement during the second round? Id.

Here, it should be noted, that there was no indicia of a proper or adequate Miranda waiver from the first interrogation, and, the resulting statements from that interrogation were coerced, involuntary and unintelligent given. It was not a short, uncoerced statement resulting from an oversight of reading *Miranda* warnings as in Oregon v. Elstad, where the police officer paused briefly in the living room and asked the young man if he had been at the scene of the crime. Id. at 614, citing Elstad, *supra*, 470 U.S. 298, 316 (1985). Instead, Mr. Rubio was confined in a Border Patrol Checkpoint office with at least two interrogators who now say that their recordings are unavailable yet he admitted to a plethora of incriminating allegations.

Justices not in the Seibert majority opined that the second statement should be suppressed due to the fact that

it is poisonous fruit, although the majority rejected this theory. Id., relying on Wong Sun v. United States, 371 U.S. 471 (1963).

Under any of these theories Mr. Rubio's statements should be suppressed as the first ones were not voluntarily made nor were they a result of an intelligent and uncoerced Miranda waiver

Besides Siebert, Mr. Rubio's statements were taken in violation of Fare v. Michael C., 442 U.S. 707, 725 (1973). As in Fare, his statements were not a product of a free and deliberate choice, rather, they were the result of intimidation, coercion, planting words in his mouth and deception. There is no doubt that Mr. Rubio was not fully aware of the rights he was abandoning nor the consequences of his "decision" to abandon them.

As such, both his Fifth Amendment rights to Due Process and his right to remain silent and not be a witness against himself have been abridged, as well as his right to be tried by reliable evidence. The extraction of his statements also violated Mr. Rubio's Sixth Amendment right to Counsel and his Sixth Amendment right to confront and cross-examine his accusers as they interrogated him. Accordingly, all of his statements must be suppressed.

**E. Miranda Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Id.; see Orozco v. Texas, 394 U.S. 324, 327 (1969).

A suspect will be held to be in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not freely leave. See United States v. Lee, 699 F.2d 466, 468 (9th Cir. 1982); United States v. Bekowies, 432 F.2d 8, 12 (9th Cir. 1970). Here, Mr. Rubio was not free to leave and was under the custody of a federal agent from the minute, if not before the minute, he arrived at the primary inspection at the Highway West-bound Checkpoint.

In Derrick v. Peterson, 924 F.2d 813 (9th Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and intelligent. Id. at 820. The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry under the [Fifth] Amendment . . . ." Id. See infra.

An involuntary waiver is determined by examining the entire course of police conduct, including, but not limited to, coercion, pressure and isolating the suspect

Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived

of due process of law if the conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the burden of proving that a confession is voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 483 (1972).

The Court must examine all "the surrounding circumstances and the entire course of police conduct." Oregon v. Elstad, 470 U.S. 298 (1985); Missouri v. Seibert, 542 U.S. 298 (2004).

The Court must also look at the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation. Berkmere v. McCarty, 468 U.S. 420 (1984).

The Supreme Court is cognizant of interrogations such as that which took place in this case. In Dickerson v. United States, the Court stated:

> In *Miranda*, we noted that the advent of modern custodial interrogation brought with it increased concern about confessions obtained by coercion. 384 U.S at 445-458. Because custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that "even without employing brutality, the 'third degree' or [other] specific strategems,... custodial interrogation exacts a heavy toll on individual liberty and trades on the weaknesses of individuals. 530 U.S. 428 434-435 (2000).

When interrogation continues without the presence of an attorney, and a statement is taken, *a heavy burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived his privilege against*

*self-incrimination and his right to retained or appointed counsel*. Miranda, 384 U.S. at 475 (italics added).

The court must make a two-pronged inquiry: 1. The statement must be given voluntarily in the sense that it was the "product of a free and deliberate choice rather than the result of *intimidation, coercion or deception*;" and 2. The waiver must be *knowing and intelligent*, in the sense that it was "made *with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it*." Moran v. Burbine, 475 U.S. 412, 421 (1986)(italics added); United States v. Sriyuth, 98 F.3d 739, 748-749 (3d. Cir 1996).

> [A]ny evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation. Miranda v. Arizona, 384 U.S. 436, 476 (1968).

> The Supreme Court has consistently held that "waivers of counsel *must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right* or privilege, a matter which *depends in each case* "*upon* the particular facts and circumstances surrounding that case, including the background, experience and *conduct of the accused*." *Johnson v. Zerbst*, 304 U.S., 458, 464 (1938); *See Faretta v. California*, 422 U.S. 806, 835 (1975); *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979); *Brewer v. Williams*, 430 I.S. 387, 404 (1977); *Fare v.Michael C.*, 422 U.S. 707, 724-725 (1979). Edwards v. Arizona, 451 U.S. 477 (1981)(emphasis added).

> Any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby. The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of power to extract answers begets a forgetfulness of the just implications of that power. *The simple and peaceful process of questioning breeds a readiness to resort to bullying* and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer, - that is, to a confession of guilt. Thus the legitimate use grows into an unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system. Such seems to have been the course of experience in those legal systems where the privilege was not recognized. 8 Wigmore Evidence (3d ed. 1940), 309 (emphasis added).

In Miranda, the Supreme Court explains how police officers are told by their training courses and manuals that the "principal psychological factor contributing to successful interrogation is *privacy* - being alone with the person under interrogation. The efficacy of this tactic is as follows:

> If at all practicable, the interrogation should take place in the investigator's office or at least in the room of his choice. The subject should be deprived of every psychological advantage. In his home he may be confident, indignant or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages/ the atmosphere suggests the invincibility of the forces of law.
>
> To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the subject is to be posited by fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he

> did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women the officers are instructed to minimize the moral seriousness of the offense, to cast blame on the victim on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already -- that he is guilty. Explanations to the contrary are dismissed and discouraged. Miranda, 384 U.S. at 450-451.

Here, Mr. Rubio, a novice to arrests and interrogations and the rules of Criminal Procedure and the American constitution was arrested by two federal agents who isolated him and who have since accused him of a very serious crime. Now the position of the government is that the two recordings of this interrogation which has led to these serious charges of conspiracy and money laundering are unavailable. The statements taken from Mr. Rubio are the result of coercion and misrepresentations about his rights. All the statements should be suppressed.

**F. The statements made by Mr. Rubio should not be used against him as they constitute "unreliable" evidence and because they violate the dictates of Federal Rule of Evidence 803(8) and Crawford v. Washington so they should be suppressed or deemed inadmissible**

The other reason the statements should be suppressed is because this scenario illustrates how statements stemming from inadequate and false legal warnings leads to the use of unreliable evidence (false confessions, or confessions containing untruthful statements). It also leads to tampering with witnesses, meaning, the police mislead the

suspect, as was done here, to say what they want him to say, not what the truth may be.

As the Supreme Court has noted, other countries do not even permit the use of statements taken by the police unless a magistrate is also present. "In India, confessions made to police not in the presence of a magistrate have been excluded by rule of evidence since 1872, at a time when it operated under British law. Identical provisions appear in the Evidence Ordinances of Ceylon, enacted in 1895... Scottish judicial decisions bar use in evidence of most confessions obtained through police interrogation." Miranda v. Arizona, 384 U.S. 436, 489 (1963).

On this grounds, too, Mr Rubio wishes to ask the Court to prevent the use of his statement in the Government's case. The police have an inherent bias, motives and they rest on the stronger end of the spectrum of power - giving one no reason to believe that their self-serving conclusions and reports are true.

Thus there is another reason the statements should be excluded is because the agents created a police report, synopsizing, based on their biases, their rendition of what was said. This is self-serving hearsay and self-serving, fabricated testimony. As it is hearsay, and because it is a police report, and because it was made in anticipation of litigation, it should not be permitted to be used at trial against Mr. Rubio. Federal Rule of Evidence, Rule 803(8). The federal rules prohibit the use of hearsay. Exceptions

are outlined in section 803 of the Federal Rules of Evidence [FRE], in pertinent part, 803(8) which permits the use of hearsay if they are public records:

> Public records and reports. Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the official or the agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding however, in criminal cases matters observed by police officers and other law enforcement personnel.... Id.

Additionally, under Crawford v. Washington, 124 S.Ct. 1354 (2004) because the agents' statements from interrogation and those contained in their reports are statements of a non-cross-examined witness, as Mr. Rubio had no opportunity to cross-examine these two men as they interrogated him, they are "testimonial" statements, *i.e.*, "pre-trial statements that declarants would reasonably expect to be used prosecutorially" (they are prepared by the prosecution specifically and only for the purpose of prosecution), they should be suppressed or deemed inadmissible against Mr. Rubio, as they all deserve Confrontation Clause protection according to the Supreme Court. Id. at 1364.

**G. If the Court fails to suppress the statements based on the "unavailability" of what constitutes the government's chief evidence against Mr. Rubio, this Court Should Conduct An Evidentiary Hearing.**

It is anticipated that the government will argue that it need not present evidence in support of its position that the Miranda motion should be denied because the defense has not submitted a declaration. The government's position is contrary to the framework established in Miranda. First,

requiring the defense to come forward with factual information shifts the burden of proof. It is the government, not the defense, that bears the burden of proof.

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

Miranda v. Arizona, 384 U.S. at 444 (emphasis added). Thus, far from requiring the defense to come forward with anything, Miranda squarely places the burden on the government.

Similarly, it is the government that bears the burden of proving a valid waiver.

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

Id. at 475 (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14 (1963) (emphasis added)).

This "heavy burden," id., cannot be met absent evidence of proper warnings and a knowing and intelligent waiver.

> "Presuming a waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."

Id. (quoting Carnley v. Cochran, 369 U.S. 506, 516 (1942) (emphasis added)). Thus, both an allegation and evidence are required.

The government's anticipated contention that there are no contested factual issues is also wrong.

> Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so.

Id. at 476 (emphasis added). These factors, combined with the unique fact in this case that the two recordings of Mr. Rubio are "unavailable" make it obvious there was no valid waiver.

In short,

> [t]he warnings required and the waiver necessary in accordance with [the Miranda] opinion . . . are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant.

Id. If the government fails to meet these requirements, the statements are not admissible. Merely claiming, in a responsive pleading, that warnings were provided and that there was a waiver is simply inadequate.

> In dealing with custodial interrogation, we will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does not show that any warnings have been given or that any effective alternative has been employed. Nor can a knowing and intelligent waiver of these rights be assumed on a silent record.

Id. at 498-99. Consequently, this Court should require the government to prove its case.

In addition, this Court must also determine whether the warnings provided were adequate. See United States v.

Bland, 908 F.2d 471, 473-74 (9th Cir. 1990), cert. denied, 113 S. Ct. 170 (1992); United States v. Noti, 731 F.2d 610, 614-15 (9th Cir. 1984). Obviously they were not adequate here.

This Court is also required to conduct an evidentiary hearing under 18 U.S.C. § 3501(a) to determine, outside the presence of the jury, whether any statements made by Mr. Rubio are voluntary.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

**V.**

**MR. RUBIO REQUESTS LEAVE TO FILE FURTHER MOTIONS**

In the event the defense receives more discovery, it is requested that Mr. Rubio be allowed the opportunity to file additional motions.

**VI.**

**CONCLUSION**

For the foregoing reasons, Mr. Rubio respectfully requests that the Court grant his motions to compel

discovery and to suppress Mr. Rubio's statements and evidence stemming from them.

Dated: February 13, 2008 Respectfully submitted,

//JOAN KERRY BADER
JOAN KERRY BADER

III.

Mr. RUBIO REQUESTS LEAVE TO FILE FURTHER MOTIONS

In the event the defense receives more discovery or additional legal issues or facts arise, it is requested that Mr. Rubio be allowed the opportunity to file additional motions.

IV.

CONCLUSION

For the foregoing reasons, Mr. Rubio respectfully requests that the Court grant his motions to compel discovery and for leave to file further motions.

Dated: February 13, 2008 Respectfully submitted,

//JOAN KERRY BADER
JOAN KERRY BADER
Attorney for Mr. Rubio