Original

JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
FAX (619) 699-5996
Attorney for Defendant RUBIO

FILED
08 FEB 20 AM 9:03
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DIEGO RUBIO-GASTELUM,<br>Defendant. | CASE NO. 07CR3283WQH<br>DATE: February 25, 2008<br>TIME: 2:00 p.m.<br>DOCUMENTS IN SUPPORT OF DEFENSE MOTIONS |

TO: KAREN HEWITT, UNITED STATES ATTORNEY;
CHRISTOPHER TENORIO, ASSISTANT UNITED STATES ATTORNEY:

The defendant, Diego Rubio-Gastelum, by and through his counsel, Kerry Bader, respectfully submits these documents in support of his motions to dismiss the indictment and/or to suppress statements and evidence.

Dated: February 15, 2008

Respectfully submitted,

[signature]

JOAN KERRY BADER

CBS NEWS

BACK | PRINT |

# Does The Nose Know?

Jan. 4, 2004

**(CBS)** Detection dogs that sniff for bombs and narcotics seem to be everywhere these days -- at airports and courthouses, on our streets and in our schools.

There's no doubt that canines can be valuable assets for law-enforcement, but are they as reliable as we've been led to believe? Some are. And some aren't. **Correspondent Lesley Stahl** reports.

The experts at the global training academy in Somerset, Texas will tell you there are no shortcuts in canine training.

Each dog requires weeks of one-on-one conditioning. Over the years, Global has supplied more than 2,000 dogs to the military, private security firms and dozens of police forces. On the day ***60 Minutes*** arrived, police Lt. Gus Ruiz and 'Phix' were being tested on their ability to detect drugs that were hidden in cars.

Ken Nelson, a partner at Global, has been training dogs for over 30 years. And Phix is 12 weeks into his training. If he and Lt. Ruiz pass this test today, they'll be certified as a team by the academy. Phix is a "passive alerter," which means that when he detects the odor of drugs, he simply sits down.

The reward? A rubber toy, something called a 'kong' that bounces. How do dogs get conditioned to love that toy so much?

"There's different theories on it. It's all fun and games. Some say that it resembles prey running away from them, from their ancestor," says Nelson, who believes there are certain dog personalities that make for the best detectors. "I like a dog that you wouldn't want as a family pet.
You want ... it's curious, it's into everything. If you left the house, he'd tear the couch up, bring down the curtains. He's just a lot of trouble."

More and more dogs are being used both for drugs and for bombs. And Nelson says it's hard to keep up with demand. Increased demand since 9/11 has also makes it difficult and expensive to obtain high quality canines.

"I used to pay top dollar for the dog and I can't match what the Japanese will pay for a dog or the Saudis," says Nelson.

Global recently raised its prices. Today a fully trained drug dog goes for almost $6,000, and bomb-detectors sell for over $9,000.

With so much money involved, however, the profession is now attracting con artists. This past summer, Russell Lee Ebersole was convicted on 25 counts of fraud after providing the State Department, the IRS and the Federal Reserve with bomb-sniffing dogs that, when given a test, couldn't detect 50 pounds of dynamite or 15 pounds of C-4 plastic explosives.

"We don't have a set of standards," says Auburn University professor Larry Myers, one of the country's leading experts on canine detection programs.

He believes there is insufficient regulation and no universal tests for the dogs: "We honestly don't have a set curriculum. We've got to get everybody up to some minimal agreed level."

He also says there are good programs that turn out reliable dogs, but some produce dogs that make lots of mistakes -- and even tell lies.

"They can tell you that something's there, that's not there, simply to get praise, to get food, to get whatever they're working for," says Myers, who adds that canine programs are supposed to train dogs specifically to avoid that problems like that. "It is a tremendous problem. We have trainers that can't train. Dogs are being used that can't --don't know how to do anything."

Do trainers have to be licensed? "In some programs, yes. And in most programs, no," says Myers.

This means that poorly trained dogs and handlers are working in many parts of the country. Which brings us to the case of Lezley Whipple in Lordsburg, N.M. After her school district hired a private handler and his dog to search for drugs, she was called out of class one day because the dog had alerted on her car.

"I wasn't too sure why because I had never done drugs, ever," says Whipple. "They searched my car and they didn't find anything."

Whipple told her parents about the search of her car, and that the dog had come into the classrooms: "There would be an announcement over the intercom. And they would say, 'We're on lockdown. Nobody's to leave the building or the room.' And the teachers would shut the door and we all had to sit in our seats. And we'd just wait there in class. Class stopped actually. And then the dog would go up and down the rows."

Lezley's father, David, and mother, Carolyn, were appalled, and demanded a meeting with the school superintendent and the high school principal.

"I actually thought it was a violation of the U.S. Constitution's Fourth Amendment," says David Whipple.

The principal defended the policy, and she handed them a letter that acknowledged no drugs were found in the search. But it also said: "You should be aware that your [child] has been in contact with an illegal substance."

"We demanded that that letter be revised because they had accused my daughter of being affiliated with an illegal substance," says Carolyn Whipple.

They did get a revised letter that said, "Lezley may have been in contract with an illegal substance." But the Whipples were far from satisfied.

"I asked the superintendent, 'How can you justify doing this to the children?' And he said, 'Because we have enough hits.'"

The handler's records showed plenty of 'hits'. The dog had alerted to the presence of drugs 72 times, but no drugs had been found 71 times.

"I asked him to stop and not to just to stop doing it to my daughter, to stop doing it to all the kids in the school district," says David Whipple. "And then he informed me that not only were they going to continue doing it at the high school and junior high, that they were going to start doing it in the elementary schools. So that's when I drew a line in the sand."

They turned to the ACLU and Jane Gagne, an attorney in Albuquerque, agreed to take the case.

"Personally, I was offended by the concept of drug dogs coming inside of the classroom where the kids are forced to remain in their seats and sniffing the kids," says Gagne. "And legally speaking, the Fourth Amendment of our constitution prohibits something like that, or should prohibit something like that."

On top of that question of unreasonable search and seizure, she was also challenging the dog's reliability since she was given no documents about the dog's training. "And so, we can only assume that none existed, which would explain the dog having had 72 or 73 false alerts within a year. The dog simply wasn't reliable," says Gagne.

When the facts were presented to the court, the judge told both sides that he wanted them to settle. Gagne made an offer: "If you'll agree to never use drug dogs to sniff the students again, and pay most of our attorneys fees, then we'll drop the lawsuit."

The school district accepted Gagne's terms and stopped using the drug dog altogether. But the question of whether it was legal to use the dog to sniff the students was left undecided.

The supreme court has ruled that law enforcement agents have the right to search property, like luggage and vehicles, if "a well-trained and reliable dog" indicates the presence of narcotics.

But what does "well-trained and reliable" actually mean? The supreme court didn't say.

Because the court was vague, defense attorneys are now challenging drug busts based on dog alerts. Richard Gaines, an attorney in Knoxville, TN, represented a couple charged with drug possession after a routine traffic stop.

A police video shows the couple's RV -- and what happened next.

"They were in a mall parking lot and the officer was talking to them, and during the time they used the dog 'Falco' around the RV," says Gaines.

Falco can be seen jumping on the door of the RV and wagging his tail. His handler would testify that this was Falco's way of alerting to the presence of drugs -- and that a search of the vehicle was justified.

"They searched the RV at that time, based primarily on that alert," says Gaines. "They go in the RV and they find some marijuana in a microwave ... They found a little bit first in the microwave. After they did a more extensive search, they found 560 pounds of marijuana in the RV."

That drugs found was indisputable, but the legality of the search depended on Falco's reliability.

"I needed the dog records, the dog's certification and where it was trained, and perhaps most importantly the usage reports," says Gaines. "Good handlers, every time they use their narcotics trained canine, will actually do a report. And the report will have whether the dog alerted, whether the dog found anything ... My opinion, the dog was neither well-trained or reliable."

Falco's usage reports showed that in controlled tests he could be highly accurate -- correctly alerting more than 90 percent of the time. But in real life situations the results were starkly different.

"The court found that Falco was 35.5 percent accurate," says Gaines. And a judge ruled that such a low success rate didn't give the police probable cause to make the search.

"The evidence was suppressed because Falco was not reliable. Now the government was very upset about that," says Gaines. "When I get evidence thrown out of court, you know even my mother's upset about it, okay? But it's the law enforcement's problem. The Fourth Amendment is there to protect our rights."

Gaines is the first lawyer to successfully challenge the reliability of a detection dog in a federal court. But unless canine training programs improve, and a universal set of standards is put in place, he's unlikely to be the last.

© MMIII, CBS Worldwide Inc. All Rights Reserved.

Feedback Terms of Service Privacy Statement