JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
FAX (619) 699-5996
Attorney for Defendant RUBIO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DIEGO RUBIO-GASTELUM,<br>Defendant. | ) | CASE NO. 07CR3283WQH<br><br>RESPONSE TO GOVERNMENT'S RECENTLY-ISSUED DISCOVERY |

TO: KAREN HEWITT, UNITED STATES ATTORNEY;
CHRISTOPHER TENORIO, ASSISTANT UNITED STATES ATTORNEY:

The defendant, Diego Rubio-Gastelum, by and through his counsel, Kerry Bader, respectfully asks this Court to incorporate the following points and authority into his Motion to Suppress, partially based on discovery provided to the defense last week after the defense had filed its original motions.

The new discovery consists of one page concerning two days of training that the canine in this case undertook with its trainer, which will be described below.

Dated: February 22, 2008

/s JOAN KERRY BADER
Joan Kerry Bader,
Attorney for Defendant
Rubio-Gastelum

JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
fax (619)699-5996
Attorney for Defendant RUBIO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DIEGO RUBIO-GASTELUM,<br>Defendant. | CASE NO. 07CR3283WQH<br>ADDITIONAL POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND TO SUPPRESS |

**I.**

**STATEMENT OF FACTS**

On or about November 18, 2007, Mr. Rubio was arrested at a Border Patrol checkpoint in the Southern District of California. 31 USC section 5332, Bulk Cash Smuggling, in the amount of approximately $250,000.00. He has since been indicted and is charged with Money Laundering, a violation of 18 USC section 1956h.

Mr. Rubio remains in custody at the Metropolitan Correctional Center on San Diego, California.

//

//

//

//

## II.

## THE GOVERNMENT HAS PROVIDED THE DEFENSE WITH ONE PAGE OF DISCOVERY CONCERNING THE CANINE IN THIS CASE THAT DOES NOT PROVE THAT THE CANINE WAS RELIABLE AND THEREFORE THE SEARCH WAS UNREASONABLE

Mr. Rubio has already moved several times for the production of the discovery. Some has been discovered but none of the evidence concerning the reliability of the canine that conducted a search in this case has been discovered. The vehicle in this case arrived at the Checkpoint and it was sent to secondary where the canine conducted a sniff search of the exterior of the car. The government had advised the defense that if the case was not resolved with a plea, then it would provide such discovery. It is presumed that this is the only discovery the government intends to offer to support its theory that the search was reasonable.

Specifically, the government produced a piece of paper that has a "PO Box 68" address listed in the top-left corner, in Campo, California, along with a small seal next to the heading, "U.S. Customs and Border Protection." It is dated July 11, 2007.

The text states:

> On July 9, through July 11, 2007 BPA Cody Sadberry and Canine Kelly (NCF 030414) participated in the United States Border Patrol Detection Dog Certification. This certification was comprised of fourteen searches in a variety of environments and distractions. The team of BPA Sadberry and Canine Kelly successfully completed this certification with the following scores;
>
> Search Score 2.78
> Indication Score 2.73

Handler Score 3.14

TOTAL CERTIFICATION SCORE 2.84 = AVERAGE

The team of BPA Sadberry and Canine Kelly are certified in the detection of concealed humans and the odors of Cocaine and its derivatives, Heroin and its derivatives, and Methamphetamine and its derivatives.

UNINTELLIGIBLE SIGNATURE
Alberto Sandoval
Assistant Chief Border Patrol Agent

Randal J. Waasdorp
Certifying Instructor

There is nothing more. Since the government has failed to produce any other evidence, despite requests since December for such discovery, the Court should prevent the government from producing any more discovery concerning this particular issue.

Additionally, the government has failed to produce the two different recordings of Mr. Rubio's initial interrogation that took place about six in the morning at the Checkpoint, approximately three hours after he was arrested.

This request is based on United States v. Caballes, 543 U.S. 405, 409 (2005) which states that canine searches may be lawful if the canine is "a well-trained and reliable dog." If the dog is not proven to be so, the search is presumably unreasonable.

Other courts have described in detail the necessary foundations that the court must consider to determine if the canine and/or its handler are qualified to support the conclusion that the search was reasonable.

As stated in Mr. Rubio's last motion to this Court, *because this canine is trained and certified to detect narcotics, specifically, Cocaine, Heroin, Marijuana, Methamphetamine, their derivatives and humans, not monetary instruments*, it is obvious the canine was not qualified to alert on monetary instruments. Thus, *all of the evidence and statements stemming from this search should be suppressed.*

Furthermore, the Court's attention is directed to Matheson v. Florida, Case No. 2D00-1611 (Second District Court of Appeal of Florida), which can be found on Google or at http://www.2dcs.org/opinion/August%2001,%202003/2D00-1611.pdf. In that case, sheriff's deputies made a traffic stop of Matheson's vehicle, who declined a general request to search the car. The deputy called for a canine, Razor. The dog was taken around the car quickly, the first time, and allowed to "linger" the second time. Only then did Razor bite and scratch the hatchback. Drug paraphernalia and methamphetamine and other narcotics were found.

Relying on state and federal authority, the Court concluded that "Although the dog's 'credibility' may be undermined by evidence of its lack of training or past unreliability, the ultimate determination as to whether the dog is sufficiently reliable to support a determination of probable cause is for the trial court as the trier of fact." Dawson v. State, 518 S.E.2d 477, 480 (Ga. Ct. App. 1999); United States v. Diaz, 25 F.3d 392, 395 (6th Cir. 1994).

While there maybe training records or testimony suggesting that the dog is "reliable," any other evidence that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. "Lack of additional evidence, such as documentation of the exact course of training, similarly, would affect the dog's reliability. As with the admissibility of evidence, generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sounds discretion." Matheson, quoting Diaz at 394.

The Matheson Court specifically rejected the State of Florida's argument that evidence that a dog has been trained and certified to detect something, standing alone, justifies an officer's reliance on the dog's alert to establish probable cause to search. The Court said, "our review of the record and of pertinent literature convinces us that this is not enough." Id.[1]

---

[1]And see: St. Petersburg Times, August 19, 2003 "Sniff search. If drug-sniffing dogs can provide probable cause for police to search private vehicles, they should be properly trained and their skills documented" Three justices ruled that the Sheriff's Office "was not doing enough to ensure that its drug-detecting dogs were conditioned to "alert" to contraband alone, as opposed to some other trigger." http://sptimes.com/2003/08/19/Opinion/Sniff and see: St. Petersburg Times, August 7. 2003 "Accuracy of drug dogs is challenged." "The court's ruling,... does not forbid drug searches by dogs or declare them uniformly unreliable. But without better training, the court ruled, Razor should not have been automatically been considered reliable enough to give deputies probable cause for the car search."

In the unanimous opinion, Judge Northcutt wrote: "however much we dog lovers may tend to anthropomorphize their behavior, the fact is that dogs are not motivated to acquire skills that will assist them in their chosen profession of detecting contraband."

In Matheson, the Deputy Sheriff dog handler testified he had not kept a record of Razor's false alert rate, as he typically left the scene of a sniff after advising other deputies that Razor had alerted. Matheson, *supra*.

The defense then presented the testimony of Razor's trainer, Sergeant Olive, who testified that Razor had completed a thirty-day training with Hillsborough County's Sheriff's Department [HCSO] in 1997 and a one-week program under the auspices of the United States Police Canine Association in June, 1998.

Sergeant Olive testified further that Razor had no training to discourage him from alerting to "dead scents", i.e., residual odors of drugs that are no longer present. He confirmed the Sheriff's office failed to maintain a record of Razor's success rate and thus it would be impossible to assess a dog's reliability "in the street" because the dog might alert on dead scents.

The defense also submitted the testimony of Dr. Dan Craig, an animal behavioral specialist and veterinarian, with extensive consultation with the U.S. military and other agencies regarding their detection dog programs. He said Razor's training was too simplistic to make him reliable at detecting narcotics for six reasons:

1. Razor was not adequately trained to search vehicles;
2. Razor was not trained with small quantities of drugs;
3. Training officers failed to plant novel odors during his training;

4. Razor was not subject to controlled negative testing, in which all objects or locations have no drugs present which reveals a false response rate and whether the handler or the dog here is guessing, which is clearly what happened in this case, given Kelly is not trained to search for money. Also, "[t]here is also the possibility that the handler may unintentionally or otherwise prompt his dog to alert." Id.

5. What may be equally relevant here, Razor was not given extinction training, which would have discouraged him from alerting to common items that are sometimes associated with drugs, such as plastic bags used for packaging.

6. There was no evidence Razor's training included "stimulus-5-generalization," which conditions a dog on one class of drugs to detect all drugs of that class.

Here, the government admits in all of its discovery that the canine, Kelly, is not trained to detect monetary instruments, thus for this reason alone, the dog is unreliable. The evidence should be suppressed.

Furthermore, there is no evidence of any of the factors outlined above. There are no training records, much less specifics as to how the dog was trained, or the handler, and for what and by what standards and methods and criteria. All we have is a vague one-page, conclusory synopsis of a two-day certification program conducted by the Border Patrol which has not been shown to be qualified to conduct such

certification programs, much less has any evidence been offered to show that they utilize nationally or internationally acceptable standards.

We have no idea what kind of training Kelly has had, or by what agency, if any, conducted the training. The Matheson case concluded Kelly was unreliable because her training required only a 70% success rate whereas the United States Customs Service requires a 12-week training program, which only half the dogs complete, and there must be a 100% success rate, and the same success rate on the annual recertification exams. None of this information has been provided by the government.

If a dog/handler team has an erroneous alert, the team must undergo remedial training, and if it fails again, they are disbanded.

In fact, the one-page synopsis provided in discovery makes it clear that the two-day program only included 14 controlled searches, and none in the field. No records are shown that the dog has been proven to be reliable "in the street." This is not anywhere near a *prima facie* showing that Kelly is presumptively reliable.

None of the training of Kelly has been provided to the defense, despite repeated requested in writing and on the record. While Razor had been shown to have passed the United States Police Canine Association's [USPCA] regime, the expert in that case showed the USPCA required only a 70% proficiency rate which he considered insufficient.

Most importantly, there were no drugs found in the car in this case, so how can we assume that the dog properly alerted or was not overly-prompted or cued by a zealous agent? As Dr. Craig explained in Matheson, "the USPCA failed to focus on the dog's ability [alone] to detect narcotics, but analyzed the ability of the dog and the handler as a team. According to Dr. Craig, without assessing the dog alone, the USPCA could not truly certify the dog's individual ability to detect narcotics. Fifth, [because] Razor was not certified to detect methamphetamine, and his training did not prepare him to reliably detect this substance" he should not be considered reliable. Id. "

Given the government's evidence of Kelly's "training," in light of each and every one of these factors above, clearly, this animal is presumptively unreliable and is not qualified to make this type of search and thus the search was invalid.

## III.

## Mr. RUBIO REQUESTS LEAVE TO FILE FURTHER MOTIONS

The government has indicated that it intends to respond to Mr. Rubio's motions filed last week, as the AUSA was out of the office until Tuesday of this week. In the event the defense receives more discovery or additional legal issues or facts arise, it is requested that Mr. Rubio be allowed the opportunity to file additional motions or responses

//

**IV**

**CONCLUSION**

For the foregoing reasons, Mr. Rubio respectfully requests that the Court grant his motions to compel discovery and for leave to file further motions.

Dated: February 22, 2008 Respectfully submitted,

/s JOAN KERRY BADER
JOAN KERRY BADER
Attorney for Mr. Rubio