KAREN P. HEWITT
United States Attorney
CHRISTOPHER P. TENORIO
Assistant U.S. Attorney
California State Bar No. 166022
880 Front Street, Suite 6293
San Diego, California 92101-8893
Telephone: (619) 557-7843
Christopher.Tenorio@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DIEGO RUBIO-GASTELUM,<br><br>Defendant. | Criminal Case No. 07CR3283-WQH<br><br>DATE: March 24, 2008<br>TIME: 2:00 p.m.<br><br>GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO:<br>1) COMPEL (FURTHER) DISCOVERY;<br>2) DISMISS (INDICTMENT);<br>3) SUPPRESS ("UNAVAILABLE" STATEMENTS); AND,<br>4) SUPPRESS (EVIDENCE DUE TO UNREASONABLE SEARCH).<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Christopher P. Tenorio, Assistant United States Attorney, and hereby files its response and opposition to Defendants' above-referenced motions. Said response is based upon the files and records of the case, together with the attached Statement of Facts and Memorandum of Points and Authorities.

//

//

# I.

## STATEMENT OF FACTS

On November 19, 2007, at approximately 3:30 a.m., Defendant Diego Rubio-Gastelum drove a white 1994 Nissan minivan ("the vehicle") to the Border Patrol Checkpoint on Interstate-8 near Pine Valley, California. Border Patrol Agent Cody Sadberry was working in the pre-primary inspection area with his assigned agency canine "Kelly." Kelly alerted to the vehicle's rear as it passed. Border Patrol Agent Ehab Rahman, who was working in primary inspection, directed the vehicle to secondary inspection.

At secondary inspection, Agent Rahman asked the defendant to exit the vehicle and turn off the engine. Defendant complied and stood nearby. Agent Sadberry brought Kelly to the vehicle and conducted a review of the vehicle's exterior. Kelly alerted to the passenger-side sliding cargo-door of the vehicle. Agent Sadberry saw bundles of money through a small hole in the door. A total of $250,280.00 was subsequently removed from the vehicle. Defendant was placed under arrest.

At approximately 6:29 a.m., Senior Patrol Agent Hiram Cuevas advised Defendant of his <u>Miranda</u> rights in Spanish, which was witnessed by Senior Patrol Agent Arturo Iniguez. Defendant stated that he understood his rights and agreed to answer questions outside the presence of an attorney. The advisal and interview was video-recorded.

Defendant explained the following to the Border Patrol agents. He was hired by an unnamed person in Tijuana, Mexico to drive a vehicle to Phoenix, Arizona in exchange for $1,000. Defendant entered the United States on foot two days prior and picked up the Nissan near

the border. A friend loaned him the Nissan. Defendant spent the night in San Diego. The following day, Defendant drove to Phoenix, where he delivered the van to an unidentified man, as instructed. The unidentified man told Defendant to wait in a movie theater while $10,000 would be hidden somewhere within the van. Defendant retrieved the van one and a half hours later and began driving back to Tijuana. Defendant admitted knowing a large amount of money was within the van and that he did not intend to declare the money upon exiting the United States.

Border Patrol agents subsequently delivered Defendant to the custody of Immigration and Customs Enforcement (ICE) agents. Shortly before 3:00 p.m., ICE Agent Thomas Swink and Chula Vista Police Officer Tony Puyot presented Defendant with a form providing his Miranda rights in Spanish. Defendant read his rights aloud, initialed the form indicating he understood his rights, and signed the waiver of his rights. When asked if he wished to answer the agents' questions, Defendant said (in Spanish), "Yes, of course." Agent Swink and Officer Puyot began the interview and were subsequently joined by ICE Agent Jason Dunham. The review of Defendant's rights and the subsequent interview were recorded on video.

Defendant thereafter confirmed to the ICE agents that was hired by an unnamed person in Tijuana to drive a vehicle to Phoenix in exchange for $1,000. Again, he stated he agreed to transport, what he believed was $10,000, from Phoenix to Tijuana.

//

//

//

//

## II.

## THE GOVERNMENT HAS PRODUCED ADDITIONAL DISCOVERY

The Government previously provided discovery on December 18, 2007 and February 14, 2008. The following addresses Defendant's additional discovery requests and his argument that necessary discovery is "unavailable."

### A. VIDEO EVIDENCE

#### 1. Primary and Secondary Inspection Video

Supervisory Patrol Agent Michael Rappold was present at the checkpoint at the time of Defendant's arrest and supervised the subsequent Border Patrol investigation. On February 26, 2008, Agent Rappold explained that vehicles that enter primary and secondary inspection at the Interstate-8 checkpoint are recorded on videotape. Because of limited resources, however, the videos are recycled (i.e., taped over) after approximately 30 days unless specifically pulled aside for preservation. Agent Rappold confirmed that videotapes from Defendant's arrest on November 19, 2007 were not pulled aside and, therefore, would have been recycled after one month.

The standard operating procedure of the recycling of videotapes from the checkpoint was confirmed on February 26, 2008, by Assistant Commander Steven Spencer, who supervises its video network. Assistant Commander Spencer confirmed Agent Rappold's report that the videotapes from Defendant's arrest were not pulled aside and, therefore, were recycled after approximately one month.

#### 2. Interview Video

Defendant was interviewed twice subsequent to his arrest. Border Patrol agents interviewed Defendant at approximately 6:30 a.m. on November 19, 2007. ICE agents subsequently interviewed Defendant at

3:00 p.m., that afternoon. A Report of Investigation ("ROI") of the Border Patrol interview was provided to Defendant on December 18, 2007. A CD with a video-recording of the ICE interview was provided in discovery the same day. Reports of the ICE interview and a copy of the video of the Border Patrol interview were provided in discovery on February 29, 2008. The two separate interviews and two sets of reports has lead to confusion, which will be addressed presently.

**a. <u>Border Patrol ROI and Video</u>**

ICE Agent Jason Dunham was named the case agent in the present matter shortly after Defendant's arrest and was tasked with collecting and delivering evidence to the U.S. Attorney's Office for Defendant's prosecution. Initially, Border Patrol agents provided to Agent Dunham an ROI of their interview of Defendant and a CD of the video-recorded interview. Agent Dunham could not open the Border Patrol's CD and assumed it was un-readable. He did not provide a copy of the CD to the U.S. Attorney's Office. He did, however, provide the Border Patrol agents' ROI detailing the advisal to Defendant and his statement. The Government thereafter provided the ROI as discovery on December 18, 2007.

Subsequently, in response to a request from defense counsel for a copy of the interview of Defendant, the present Government counsel contacted ICE Agent Dunham on January 23, 2008 to request a copy of an available disc. Government counsel made the request under the assumption that only one interview of the defendant had been conducted, but was simultaneously recorded by both Border Patrol and ICE agents. Agent Dunham stated that the Border Patrol's original recording of the interview was inoperable. Government counsel relayed the information to defense counsel.

On February 26, 2008, upon further questioning by Government counsel, Agent Dunham explained that the video of Defendant's interview taken by ICE (which had been provided to Defendant) is operable, but that the video taken by Border Patrol was not. That same day, Government counsel contacted Border Patrol Agent Jeffrey Dinise who explained that he would provide a copy of the Border Patrol agents' interview. On February 28, 2008, Agent Dinise provided Government counsel with a CD of the Border Patrol interview. He explained that the video could not be viewed by a DVD, but could be viewed using a computer program such as the Windows Media Player. (ICE Agent Dunham confirmed that the video of the ICE interview is in DVD format). Government counsel confirmed the video was viewable and that the Border Patrol and ICE agents conducted two separate interviews. The Government provided the CD containing the video of the Border Patrol interview to Defendant for the first time on February 29, 2008.

**b. ICE Video and ROI**

As explained above, discovery of the ICE interview was provided to Defendant on December 18, 2008. The video is in DVD format. Government counsel did not learn of the existence of ICE ROI's until February 29, 2008. The reports were obtained by Government counsel and provided to Defendant that same day.

Defense counsel had previously reported that she could not open and view the copy of the ICE video previously received. Unclear is whether Defense counsel did not attempt to open the disc with a DVD player or a computer with DVD capabilities. In an abundance of caution, a second copy of the ICE video (which was determined to be operable) was provided in discovery on February 29, 2008.

**B. <u>CURRENCY EVIDENCE</u>**

According to Border Patrol Agent Josh Arrellano from the Border Patrol's Asset Forfeiture Division, the currency seized in the present case was deposited into a bank by Border Patrol Agent Matthew Rainwater on November 20, 2007 and were co-mingled with the banks funds. Inspection of the currency seized, therefore, is not possible.

**C. <u>VEHICLE EVIDENCE</u>**

On February 26, 2008, Agent Arrellano confirmed that the vehicle is being held at the American Towing facility in San Diego and is available for inspection. The vehicle is not subject to seizure.

**D. <u>TECS EVIDENCE</u>**

A review of the Treasury Enforcement Communication System (TECS) database revealed that the vehicle driven by Defendant at the time of his arrest had not crossed at a port of entry within the previous 72 hours.

**E. <u>IMPEACHMENT EVIDENCE</u>**

Defendant renews his request for impeachment evidence. The Government has complied with Defendant's earlier request and has provided all available discoverable evidence relating to the arresting agents. Prior to trial, the Government will further conduct a <u>Henthorn</u> request concerning all expected witnesses.

**F. <u>CANINE TRAINING EVIDENCE</u>**

Defendant requested further discovery regarding the certification of narcotics-detecting canine "Kelly." The certification was provided on February 14, 2008. Defendant further requests extensive discovery of Kelly's training records.

On February 26, 2008, Government counsel had further discussions with the supervisor of the Border Patrol's Sector Canine Office and

Sector Counsel regarding the need for evidence of Kelly's training records. The Sector has agreed to provide the results of Kelly's training for the six months prior to the alert in the present case. Officers are currently redacting from those reports undiscoverable information, such as training techniques, the form of alerts, and the location of alerts. The Government expects the redacted form of the evidence will be available in the very near future and will provide the evidence as discovery immediately upon its receipt.

## III.

## ESSENTIAL EVIDENCE WAS NOT "UNAVAILABLE" AND THE INDICTMENT NEED NOT BE DISMISSED

Defendant argues that the indictment in the present case should be dismissed because, as he alleged, the Government made Defendant's statements "unavailable." As discussed above, however, evidence of Defendant's statements were made available on December 18, 2007 - the ROI of the Border Patrol interview and the video of the ICE interview. Although defense counsel claims that she was unable to view the ICE interview, it was, nonetheless, "available."

Additionally, the ROI's of the ICE interview and the video of the Border Patrol interview were made available on February 29, 2008. The availability of all ROI's and videos, therefore, makes Defendant's argument regarding unavailability moot. The indictment, therefore, should not be dismissed.

//

//

//

//

//

## IV.

## DEFENDANT'S STATEMENTS SHOULD NOT BE SUPPRESSED AND NO EVIDENTIARY IS NECESSARY BECAUSE VIDEO EVIDENCE PROVIDES THAT MIRANDA WARNINGS PRECEDED INTERROGATION, THAT DEFENDANT'S WAIVERS WERE KNOWINGLY AND INTELLIGENTLY MADE, AND STATEMENTS WERE VOLUNTARILY MADE

Defendant moves to suppress his statements on the alleged bases that the interviewing officers failed to comply with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966) prior to conducting custodial interrogation, that the waiver of his rights was not voluntarily and intelligently made, and that his statement was not voluntarily provided. In support of his motion, Defendant filed a declaration that the agents scared him, or that he indicated he did not want to speak with the agents. Defendant's declaration, however, is inconsistent with the video recordings produced by both the Border Patrol and ICE.

Consistent with the Border Patrol agents' ROI, the video of their interview of Defendant provides no evidence of coercion, provides that they advised Defendant of his Miranda rights in Spanish, that Defendant indicated he was voluntarily and knowingly waiving his rights, agreed to make a statement, and thereafter made a voluntary statement. Likewise, video of the ICE interview (which had been available to Defendant since December 18, 2007), shows that Defendant personally read his rights in Spanish, signed a form indicating he understood and waived his rights (which was also available as of December 18, 2007), orally agreed to make a statement, and thereafter made a voluntary statement. Specifically, when asked by ICE agents whether he wanted to make a statement, Defendant stated, "Yes, of course." Translated transcripts of the advisals and copies of the video can be provided to the court. A review of the videos and

transcripts should satisfy any concerns regarding the voluntary nature of Defendant's waivers and statements and obviate the need for an extensive evidentiary hearing. See United States v. Batiste, 868 F.2d 1089, 1092 (9th Cir. 1989) ("Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court.") (citation and quotation marks omitted).

Defendant also moves for this court to suppress his statement on the presumption that evidence was inherently unreliable and biased because his statements were only memorialized in the agents' reports. Defendant's argument was made on the presumption that video evidence was available. Defendant may reconsider the motion in light of the available evidence. Any argument that the agents' statements are inherently unreliable may otherwise be addressed on cross-examination of the agents at trial.

Defendant also requested an evidentiary hearing to address the "unavailability" of his statements. In light of the preceding, this argument is also moot.

## V.

## THE SEARCH OF DEFENDANT'S VEHICLE WAS REASONABLE AND SUPPRESSION IS UNJUSTIFIED

Defendant also moves for the suppression of evidence on the basis that discovery is unavailable, the narcotics detector dog was unreliable, and the search was unreasonable. Defendant, however, provides insufficient support for his argument.

### A. TRAINING RECORDS ARE NOT NECESSARY FOR MOTION

Pursuant to Federal Rule of Criminal Procedure 16, the defense is entitled to discovery of the qualifications of a narcotics detector dog which alerted to the presence of potential contraband in a seized

vehicle. United States v. Cedano-Arellano, 332 F.3d 568, 571 (9th Cir. 2003). Where the dog's handler will testify regarding the dog's certification, training and certification materials are necessary for the defense to assess the dog's reliability and conduct an effective cross-examination of the dog's handler. Id. Once the dog has been shown to be certified, any further evidence regarding its accuracy, however, should be considered only in the context of its credibility, not its qualifications. See United States v. Robinson, 390 F.3d 853, 874 (6th Cir. 2004); see also United States v. Gonzalez-Acosta, 989 F.2d 384, 389 (10th Cir. 1993) (holding that discovery of certification only, not training records, was deemed sufficient where the dog was certified on the day in question and because the dog properly alerted to the presence of contraband).

As addressed above, the certification of Kelly, the dog used in the present case, was previously provided to Defendant.[1/] Records of the dog's training will be provided in short order. The training records, however, are pertinent to the issue of credibility - an issue

---

[1/] Defendant indicates that requests were made for canine discovery since December, 2007. The Government had several memorialized discussions with Defendant, however, that the production of the requested evidence would not be obtained and produced unless and until Defendant rejected the Government's plea offer. The Government explained that its plea offer would be revoked if it first obtained and provided the canine discovery. After Defendant considered and rejected the Government's plea offer on January 29, 2008, the Government obtained the certification and immediately provided it to Defendant.

for trial - and should not be dispositive of the dog's qualifications. See Robinson, 390 F.3d at 874; Gonzalez-Acosta, 989 F.2d at 389. Defendant's motion, therefore, can be addressed presently despite the fact that receipt of the training records is pending.

**B. THE SEARCH WAS REASONABLE**

Defendant argues that the evidence obtained pursuant to the search in the present case should be suppressed because the search was unreasonable. His motion is based in part upon the position that the narcotics detector dog was not trained to detect monetary instruments.

Defendant argues that a "search is presumably unreasonable" where a narcotics detector dog is not proven to be well-trained and reliable. [Defendant's Response (Document 21) at 4.] Although Defendant asserts this position after citing [Illinois] v. Caballes, 543 U.S. 405, 409 (2005), neither this case nor any other supports Defendant's argument. A canine sniff can supply probable cause where there is proof of "the dog's reliability." United States v. Lingenfelter, 997 F.2d 632, 639 (9th Cir. 1993). There is no case law, however, that identifies a presumption of unreasonableness where the dog's reliability is questioned.

A vehicle may be stopped at a permanent checkpoint for a brief immigration inspection even absent individualized suspicion. United States v. Martinez-Fuerte, 428 U.S. 543, 562 (1972). An agent has wide discretion to refer such a vehicle to secondary inspection and may do so without particularized reasons. Id. at 563. In the present case, Defendant's vehicle was sent to secondary inspection at an interior immigration checkpoint after the narcotics detector dog alerted. In secondary inspection, the dog alerted to the passenger-side door. The second alert justified a further search. Officer

Sadberry, therefore, was justified in looking into the hole in the door.

The fact that the dog was not trained in the detection of monetary instruments is irrelevant. See United States v. McCranie, 703 F.2d 1213, 1218 (10th Cir. 1983) (alert by explosives-sniffing dog not formally trained to detect drugs nonetheless created reasonable suspicion that defendant's suitcase contained contraband). Despite no training for detecting money, a narcotic detector dog's reaction to the money bears on the probability that the money had originated from an illegal source. United States v. Guerrera, 554 F.2d 987, 989 (9th Cir. 1977). Indeed, the dog's alert in secondary inspection indicated the presence of narcotics residue on the currency and justified the search.[2/]

The fact that an illegal contraband other than narcotics was found does not undermine the justified search. Evidence in "plain view" is properly seized where the agent had a prior justification for the intrusion that allowed him to plainly view the evidence, the discovery of the evidence was inadvertent, and it was immediately apparent to the agent that the evidence found is incriminating. United States v. Miller, 769 F.2d 554, 556 (9th Cir. 1985); Coolidge v. New Hampshire, 403 U.S. 443, 466, 469 (1971) (plurality opinion), abrogated on other grounds as recognized by United States v. Ewain, 88 F.3d 689, 693 (9th Cir. 1996)); see also United States v. Bulacan,

[2/] ICE Agent Jason Dunham was questioned about the dog's alert on February 29, 2008. Agent Dunham explained that the specific smell of marijuana on the currency was "overwhelming" and "obvious," even to him. He will produce a report reflecting this observation.

156 F.3d 963, 968 (9th Cir. 1998) (holding warrantless seizures are constitutional under the plain-view doctrine in situations where "the incriminating nature of the object must be immediately apparent and the officer must 'have a lawful right of access to the object itself.'") (quoting Horton v. California, 496 U.S. 128, 137 (1990)).

In United States v. Soto-Camacho, 58 F.3d 408 (9th Cir. 1995), the defendant challenged the admissibility of drugs seized pursuant to an administrative search conducted at a border checkpoint where agents saw drugs in plain view. The Ninth Circuit determined the search was legitimate because the agents had an independent justification for the search and did not exceed the scope of the justified search in finding contraband in plain view. Id. at 412.

Here, the dog's alert justified the search in secondary inspection. Looking into the hole in the door, Officer Sadberry did not exceed the scope of the search. See Soto-Camacho, 58 F.3d at 412. He inadvertently saw the currency and it was immediately apparent that the currency was being hidden for illegal purposes. See Miller, 769 F.2d at 556; Bulacan, 156 F.3d at 968. Because the currency was properly seized, therefore, no suppression is required. See Soto-Camacho, 58 F.3d at 412.

## VI.

## LEAVE TO FILE FURTHER MOTIONS SHOULD BE LIMITED

Defendant moves for leave to file further motions. As explained above, the Government does not oppose any additional motions based upon newly-received discovery.

If the defendant foresees the need to file further substantive motions subsequent to the motion hearing on March 24, 2008, however, the Government respectfully requests that the defendant request, and

the Court set, a separate date for an additional motion hearing separate from a motions in limine hearing.

VII.

**CONCLUSION**

Based on the foregoing, the Court should deny Defendants' above-listed motions.

DATED: February 29, 2008

Respectfully

KAREN P. HEWITT
United States Attorney

s/Christopher P. Tenorio
CHRISTOPHER P. TENORIO
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. DIEGO RUBIO-GASTELUM, Defendant. | Criminal Case No. 07CR3283-WQH **CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED that:

I, CHRISTOPHER P. TENORIO, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of **GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS** on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

**J. KERRY BADER, ESQ.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 29, 2008

Respectfully submitted,

s/ Christopher P. Tenorio
CHRISTOPHER P. TENORIO
Assistant U.S. Attorney